Good morning. Good morning. May it please the Court, Brian Kang appearing on behalf of the appellants. I'd like to reserve five minutes of my time for rebuttal. All right. Watch the clock. And would you pronounce your client's name? Yes. It is Steve Ag's Ag Services, Your Honor. All right. Appellants concede for purposes of oral argument this morning that the district court had jurisdiction over this quiet title action pursuant to 28 U.S.C. 2409A and will instead focus on the substantive points of its appeal. It is undisputed in this case, even by the State, that the official boundaries of the ahupua'a of Kahuku have been established for over 130 years. For over a century, Hawaii courts have recognized that boundary certificates issued by the Boundary Commission, such as CB 85 in this case, are binding and conclusive judicial determinations that take precedence over other types of government surveys and maps, including registered map 2468 and any other map the State may wish to show the Court today. There is nothing in the district court's findings of fact and conclusions of law that acknowledges, much less analyzes, the unique and superior status of certificate of boundaries under Hawaii law, and that is at the heart of the alleged error of law in this case. However, it seems to me, before we get very much along, since that's where you want to go, that also the Hawaii law would suggest that a judge or jury, if the certificate of boundaries are ambiguous, may look at other information, including surveys, maps, notes. I've seen so many maps that I, you know, it seems to me we're really looking at whether they're ambiguous, aren't we? Well, Judge Smith, that's correct. What is the standard of review on ambiguous? Well, Your Honor, we believe that if it is an ambiguous factual matter, that it would be clear error, Your Honor. Just a minute, just a minute. Is the determination of ambiguity a factual determination? Well, Your Honor, we believe a factual determination. Yes, Your Honor. So at that point, in order for us to undo the district court, we need to find clear error. Well, respectfully, Your Honor, we disagree in the sense that you can't disagree if that's the standard of review. You've either got to say the standard of review is not clear error, it's not a factual determination, it's a legal determination, which I don't know what case you're going to go to to get there, or you've got to say it's a factual determination, which upon, if it's a factual determination by the district court, I can only overturn it if it is clear error. That's the standard of review. That's why I wanted you to focus on that, because if you're going to say it's clear error, okay. But if not, then I'm stuck with what the district court did. Well, Your Honor, we do believe that is the correct standard in terms of clear error. We also allege, Your Honor, however, that the district court, in analyzing the relevant maps in this case, particularly CB-85, did not apply the correct standard of law in this case, given the Omerod decision, which states that certificates of boundaries, such as CB-85 in this case, are required to be given preclusive effect, have the effect of collateral estoppel. Just a minute. If, in fact, these certificates are ambiguous, one doesn't give that. Well, respectfully, Your Honor, we disagree in the sense that once a court determines, perhaps, that a particular certificate of boundary may be ambiguous, it is required under the Omerod case to construe that certificates of boundary by using other evidence, including surveys, maps, and notes. It may, Your Honor. It may do so. But in doing so, it still has to comply with the legal standard in the Omerod case to give it collateral estoppel effect and to give it the effect of a judicial determination. And that, in construing it, we're not saying, Your Honor, that the district court could not construe CB-85 in looking at different types of maps and surveys in this case. But what we are saying, Your Honor, is that in construing CB-85, it still had to give the intent of the grantor, which was the government in this case, as well as in construing CB-85, it did have to recognize that CB-85 was a judicial determination of the government entitled to collateral estoppel effect. And in that situation, if we look at the court's findings of fact and conclusions of law, respectfully, the court did not undertake that analysis. What it did is it looked at CB-85, it determined that perhaps there were some ambiguities within the document, but then it relegated it to a historical document. And that was the end of the district court's analysis of CB-85. Well, the only reason that I point this up is that this is a little bit different than the norm. In other words, these certificates of boundaries are judicial determinations. So, at that point, whether they're law or whether they're fact is a good question. And I guess then the next determination is whether what the judge said in those determinations is clear or ambiguous is another determination. And it seems to me that that's of some major effect as to how much I give to your evidence. In other words, if the district court is entitled to a clear error review, I've got to find something that was clearly erroneous. Whereas, if it's a question of law, I can look at it myself, decide what I'd do. Well, Your Honor, respectfully, we do believe it is a question of law in the sense that, again, the district court And now you're changing a little bit? Well, no, I don't believe I am changing, Your Honor. I believe our position is consistent in the sense that the district court was required to recognize the judicial nature of the certificate of boundary in interpreting CB 85. And we are not waiving the argument, Your Honor, in terms of the clear error, obviously. We do believe that in the area where CB 85 was interpreted by the district court, that CB 85 did state where the boundary of Kahuku was. And that was through Courses 8 through 14 of CB 85. And the state recognized repeatedly after CB 85 was issued, and the reason why we have this map here, 2171, up here, is because after CB 85 was issued, in conveying the ahupua'a of Kalika and Papa, the state recognized where the boundary of Kahuku was pursuant to CB 85. So, Your Honor, after this map was created, then the map of South Kona, the 2468 at issue in this case, was created, which did move the boundary of Kahuku, and for the first time showed the remnant parcel. Now, again, going to the factual issues, Your Honor, even after 2468 was created, the state continued to convey additional parcels within Alika, five years later, up to and along the boundary of Kahuku, again, recognizing that there was no remnant parcel. But wasn't that up to the boundary of what everybody believed was Kahuku? Well, Your Honor. Isn't that the problem? The district court did insert some language in some of the conveyances, indicating that the intent of the grantors were to convey to what they thought was the boundary of Kahuku. And that, in fact, the original fencing and the ahupua'a were not. It was less land than the boundary of Kahuku. That's correct, Your Honor. However, that being the case, respectfully, the grants clearly do not state where we think the boundary of Kahuku is. What the grants state for the Alika and Papa boundaries is only that those parcels go to and along the boundary of Kahuku. There is no intent within any of those conveyances, I think reasonably, where one could construe that the intent really was to go to where we think it is. The intent clearly given the grants was to go to and along the boundary of Kahuku. Well, the district court, it seems to me, as my good colleague has suggested, was applying the relevant rules of construction when it determined that the intent of the parties was to convey these parcels to the marked boundary. And that although the marked boundary didn't actually correspond to the true Kahuku boundaries, the parties were referencing a boundary, and they always treated the boundary as the eastern boundary of Alika and Papa grants. That's what the district court said. Well, respectfully, Your Honor, we believe that that is certainly what the district court said. However, under Hawaii law, the controlling factor in terms of conveyances is the intent of the grantor over everything else. So in terms of the fencing of the boundaries, in terms of the area of the conveyances, as the district court pointed out that the area of the conveyances seemed to indicate that the boundary was moved, all of that is still subject under Hawaii law to the intent of the grantor. And the government in this case, not only before 2468 was entered, but after 2468 was entered, expressed that intent to convey these parcels to and along the boundary of Kahuku. So, Your Honor, we believe that under Hawaii law, and again this is the Kelly-Colio case among others, that the intent of the grantor must control in this instance. Right, but the district court found that you could construe the intent to be either one, either the actual border or what we think is the actual border. Yes, and that is what the district court did. However, again, Your Honor, if there was an intent to state to where we think it is, that intent certainly was not reflected in the document at all. It was certainly not expressed in the document, and it was not expressed in the document before 2468, and it was not expressed in the document after 2468. Well, but the real issue is where in the court record, which a court had a trial now, they're determining facts after receiving evidence and hearing people talk. Is there just an absolute lack of evidence of such intent? Well, there was certainly... That's the, in my book, that's the view I have to take. I don't say, well, I frankly think that Brian's a pretty good guy, and I just said your last name, but I can't know whether it's Hang or Kang. John, Your Honor, thank you. And I may say that, but the bottom line is I can't do that on appeal. Having been an old DJ, I'm glad I can't do that on appeal, because at that point I'm supposed to be saying here has the court. They have a trial. They have the evidence. They listen to the testimony, and at that point they determine intent based on that. And the only way I can really undo their determination is to suggest there's a complete lack of evidence to suggest that. And, Your Honor, respectfully, that's correct. However, again, under the O'Mara case, we believe that in construing that intent and in construing the facts, the court was required to give the proper effect to CB 85 and to construe it as a judicial finding in terms of the boundaries. Seeing I'm almost out of time, if the court has no further questions, I'd like to reserve the balance of my time. All right. Thank you. Your Honors, may it please the Court, William Weinhoff, Deputy Attorney General appearing on behalf of the State of Hawaii. Your Honors, may I take one second of my time to get my exhibits that I hope to emphasize to the Court? All right. Thank you. Thank you, Your Honors. I know you've had an opportunity to look at many, many maps, and I wanted to just first show you the first map in the supplemental excerpts of the record, which is the U.S. quadrangle map. And you can see the stage property is there. Kahuku runs along the right side of it all the way down. Here's Arika. Here's Papa 1. So the first question, I guess, was whether it's in Kahuku or not in Kahuku, and that's the issue of what does CB 85 mean. We think that the district court clearly and properly understood that CB 85 was a judicial determination that's entitled to binding effect. Nobody ever disputed that. The state doesn't dispute it now. The question is, what does CB 85 mean? And the question as to whether or not CB 85 is ambiguous is one that we put on quite a bit of evidence on, and we think we're absolutely right on that. What CB 85 does, what any kind of conveyance does, is it puts down boundary points. It does two things. It puts down boundary points. In this case, Hitchcock went out in 1876, actually put down, in some cases, the ahu, which is the Hawaiian way of saying a pile of stones or something, and he also used natural monuments. And then he did something else. Then he described how to get from one to the other. He might have said, at the podium, go directly north 100 feet. Well, you go directly north 100 feet and you're not at his ahu, and that's what we show on Exhibit 31. I want to ask you the same question I asked counsel. The ambiguity determination by the district court, do I owe any deference to that? Yes, Your Honor, because I believe it's an issue of fact. The issue of fact is, the reason is, is because you have to have some extrinsic evidence to understand how you get. The reason I ask that question is because in contract law, whether something is ambiguous or not is not necessarily a question of fact. I agree, Your Honor. I understand that. And I think the difference here is that you can't, just by looking at it, it's impossible to tell from the four corners of the document whether that description by chains and distances is ambiguous or not ambiguous. As you saw by looking at CB85, it starts off at the seacoast on Kamamalu. I'm sure I'm not saying that right. I practiced it, but I didn't say it right. But you start off at the seacoast and you go along a certain number of chains in a certain direction to the next one. It's impossible for you sitting here to know from the face of that document whether or not that is, in fact, ambiguous. And so the evidence shows that it is ambiguous, and I don't think there's really any doubt about that. Nobody's ever said it's not ambiguous. There hasn't been any discussion in any of the papers that said it's not ambiguous. I didn't hear today that it wasn't ambiguous. The question is, what do you do with it when it is ambiguous? I would respectfully submit. And what we showed on Exhibit 31, which I think is a really nice piece of evidence, which I always like just from an evidence point of view, is you have four different lines. The first one, four different lines, each one of them starts from a natural monument. The first one starts down at the bottom, goes along, and just following the chains, the meets and bounds, you go by and you end up in the area of our property. You end up 4,000 feet to the west of our property. You don't go through any of the other natural monuments. There's the water hole. There's the crater, which is the way we know it now as Mauna Loa Crater. And there's the seacoast. So if you start there, if you start at the seacoast, you don't go through any of the monuments. You're not even close to where we think the boundary is. Similarly, if you start, oh, I skipped one, and this is an important one, because this is the one that the loggers would try to argue was the boundary of Kahuku. You start at this crater, Pu'u Ohia Crater, you trace it around. You don't go through any of the other monuments. You don't end up closing. But importantly, that's also not the boundary that we know where it is. It goes 500 feet or 700 feet west of where they say the boundary is. So there's nothing that goes through their boundary. It's not that easy to see on 31. It's a little easier to see on Map 30, which is the same line as traced on Map 30, and that's discussed in Glenn Cordani's testimony. So it's our position, Your Honor, that with respect to CB-85, CB-85, and actually there's dozens, actually, of starting points. We traced these four because these are natural monuments, very easy to see and very easy to understand today. Some of the other ones that say, you know, the edge of a lava or the Ahu or something, those are a little more difficult to find, obviously. But if you started anywhere, you wouldn't go through any of the other Ahu, and you wouldn't end up in the place you started. So all of the – and actually, if you think about it, I had actually in the – I was going to bring to the trial corporate. I didn't, but a chain is just exactly that. It's a chain, and it's 8 feet long or 10 feet long or something, and you're dragging it around over broken lava and a forest, and it's not really that surprising that it's off, but it is off. And so then the question is, what are you going to do with that? And what we say you do with it is we went through some painstaking detail, I believe, about the detail that the state and its predecessors went through to find out where those Ahu actually were. Nobody changed the Ahu. That's the key point with respect to CB-85. All of those Ahu are there. They've always been there, and the only thing that was changed was how do you describe how you get from one Ahu to the other. Hitchcock went out there and he located some of the monuments and he put in other Ahus, put in piles of stone to show where the boundary is. We didn't change the boundary, never. The territory didn't change the boundary.  The kingdom didn't change the boundary. All we said is this is the correct way of describing how you get there. If you start with a seacoast, you've got to walk this direction and you've got to walk that direction. And so that's Kahuku, and that's what the court found. With respect to Alika, Your Honor, the question there is nobody even disputes. That's a question of the intent of the parties. So, again, there's got to be clear error. No question, just to summarize our evidence, because I know you've read it, each of the grants in Alika says at least three things. It says to these particular Ahu, it says a certain meets and bounds, a certain distance and azimuth. It says a certain quantity of land, and it says to the Kahuku border. So all of those things cannot be correct. The boundary that is shown on 2468, this is one of the copies of 2468. Is that the one that counsel just put up, the other one? No, Your Honor. Counsel put up a 1903 map, which was 2171, registered map 2171. This is 2468, which came out in originally 1908, I believe, or 9, a little later. The boundaries in 2468, which we're showing here, and those are the boundaries that the court found, they accomplish several things. First of all, they go through the Ahu that's on the ground. There's some discussion of the hierarchy of calls. It's absolutely clear, and everybody understands what you're supposed to do, if nothing else, is you go through the Ahu on the ground. It goes to the Ahu on the ground, gives them the right amount of acreage, and is consistent with start at this Ahu and go this number of feet. If you go to the actual Kahuku border as it is now, you walk too far, you give them too much acreage, and you're not on the Ahus. And it's also consistent with what I always thought was the most telling piece of evidence with respect to this. It's consistent with where the people to whom we granted it fenced it at the beginning of the 20th century. They knew and intended where their boundary was because that's where they put their fence. They had a duty under their conveyance documents to put in a fence along their property, and we didn't go out there and tell them where to put it. That's where they put it, and the evidence is in the record on that. Michael Konstantinidis testified to that. I know it's in the SCRs, and I forget the exact page, although I have it written down, but there's also testimony from their expert. Let me ask you a question. Was there any evidence that any entity laid claim to that parcel before the logging incident? No, Your Honor, and there's testimony in that, too. That's Michael Konstantinidis testified. He had been up there a number of times, and he testified that he'd never heard anything different from EHOP, and he'd never heard anything different from the United States. There was no claim by anybody else. Did the state claim it before the logging incident, or was it just unused property? I beg your pardon, Your Honor. Did the state ever make a claim to it before the logging incident, or was it just unused property? Yes, Your Honor. Yes, Your Honor. Our people have been up there many times. We just always assumed it was our property. On the north side, that's the ahupua'a of Kipahoehoe. Kipahoehoe is owned by the state. It is what we call a natural area resource NAR, natural area resource area, I guess. Anyway, our property is bounded on the north by that, and when we went up there, we always just understood and assumed that that was part of the NAR, and that's, in fact, how we found out that the logs had been taken from this area. Around 2000 or 2001, our forester guys were up there in their NAR, and they went down to look at our property, and they went down and they saw, hey, all the koa trees are gone. Your Honors, There's a great deal mentioned about the fence. What is the evidence concerning when the fence was put there, how long the fence was there? The evidence concerning the fence, I know Mr. Constantinidis testified that it had been there for at least several decades. He did not know when it was in there. There was also evidence in the record, the original grant to these adjoining people in Alika were by way of homestead leases, and the homestead leases, the evidence showed, the homestead leases were in the record. The homestead leases show that part of their duty in order to actually get the fee simple conveyance was to fence their property. The evidence also shows that contemporaneously at the time before the state gave them their deeds, there was a person from the state went out there and attested that the fence had been put in. We know that a fence was put in. We know that these fence remnants were out there for decades or more, but the evidence was not sufficient to show that the fence remnants were the exact ones that had been put out there in the early 20th century. However, that was a reasonable influence, which I believe the district court drew. With respect to jurisdiction, I know there wasn't any discussion of it on the opening argument, and I won't therefore add anything to what I said other than I would like to direct the court's attention if you are considering that to appellant's own case of Lay-Snoy v. U.S. 170 F. 3rd 1188, in which they talk about in some senses a similar case to this because they're saying at page 1192, the peculiarity of this case is although that the United States did not itself assert its interest in title, a third party insisted that the United States had title. I'm skipping some of the words. I think the microphone gets fuzzy if you get too close. Yeah, I'm sorry. I understand. And then the question was, can a third party's assertion that the U.S. had adverse claim sufficient to thwart the initial jurisdiction? We conclude, quote, we conclude that a third party's claim of an interest of the United States can suffice if it clouds the plaintiff's title. And so that would clearly be the case here even if any of the other things that I mentioned were somehow deemed to be insufficient. The United States removed it to federal court claiming that it had an interest. And then so, you know, we're kind of stuck basically. We couldn't do it in state court. We couldn't do it according to their theory. We couldn't do it in federal court. I don't think that's the law. It certainly doesn't say it in the statute unless you torture the statute a little bit. And I don't think there would be any particular reason to torture the statute to come up with a result that, frankly, I would find a little bizarre. So, Your Honors, unless you have any questions, that would be my presentation. I have no questions. Thank you, Your Honors. Pleasure to talk to you. Good trial tactic. Use his own exhibit against you. Very briefly, you know, the State pointed out to this trial exhibit in terms of the different iterations of CB-85, and it is correct. You know, there are different iterations in terms of where the boundaries of Kahuku are even under CB-85. But the point, I think, is that three out of those four iterations show that the subject parcel is within the Kahuku. And the point that we're making in terms of the Omurad case is that the district court should have undertaken the analysis in terms of giving the effect of CB-85 its deference in terms of a judicial finding. And, you know, I think the Omurad case is enlightening in the sense that in that case there was a dispute in terms of whether one or two ahupua'a were granted pursuant to the certificate of boundary in that case. And what this Hawaii Supreme Court found in that case is that they would not consider some allegedly more persuasive surveys or credible surveys, but they would give effect, again, to the certificate of boundary. So they did not take into consideration the other allegedly credible surveys. And finally, you know, there was some argument by the State in terms of no one changed the ahupua'a, et cetera. And the point is that, you know, the whole State's case rests upon a notation on 2468 in terms of Mr. Wright allegedly making a mistake in terms of the ahupua'a. But the point in terms of our latches and equitable estoppel arguments is that no one was available to testify at trial in terms of the personal knowledge of the surveyors in this case, which caused prejudice to the clients. Thank you very much. Thank you. Thank you, counsel. Hawaii v. Steve's Ag Services is submitted.
judges: Alarcon, Wardlaw, Smith N. R.